UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

COLONEL FINANCIAL MANAGEMENT
OFFICER, et al.,

     Plaintiffs,

v.                             CASE NO. 8:22-cv-1275-SDM-TGW

LLOYD AUSTIN, Secretary of the
Department of Defense, et al.,

     Defendants.
_____/

## ORDER CERTIFYING CLASS AND
## <u>ISSUING CLASSWIDE PRELIMINARY INJUNCTION</u>

According to the Department of Defense's August 4, 2022 "Monthly COVID-19 Update," cited in the record by the Marine Corps (Doc. 224 at 7) to "underscore the individualized consideration" given to each request, 3,733 Marines have requested under the Religious Freedom Restoration Act a religious accommodation from receiving the COVID-19 vaccination ordered by the Secretary of Defense in August 2021. The Marine Corps has granted only eleven accommodations, less than three-tenths of a percent (0.295%) of the 3,733 applications. The record presents no successful applicant other than a few who are due for retirement and prompt separation.

The record shows that the other three-thousand-seven-hundred-plus religiously objecting Marine applicants are either denied already or rapidly proceeding to an

apparently (on the present record) inevitable denial, and in either instance are await-ing forced separation from service; regardless of seniority; regardless of specialized skill and training; regardless of depth and breadth of experience; regardless of distin-guished service; regardless of the current state of international turbulence and dan-ger; regardless of the place and circumstances of each applicant's service; and regard-less of other considerations (for example, the difficulty in recruiting equivalent re-placements).  The record shows that the Marine Corps's implementation of the Sec-retary's directive enjoys at least two, even if no other, benefits to the Secretary and the Marine Corps:  unmistakable clarity and unwavering consistency.  But neither is what RFRA commands.

The pertinent history in this action reports that not for one Marine in continu-ing service (of course, a token one or five or ten Marines among the 3,733 applicants would not change the case) — not for one bookkeeper or for one inventory manager; not for one data analyst; not for one "jarhead" who served abroad "in harm's way" throughout 2020 and 2021 during the height of the COVID-19 epidemic but without vaccination; not for a single Marine, no matter how young, strong, or gloriously healthy and not even if the Marine already contracted COVID-19 and recovered without material consequence — in not one case has the Marine Corps agreed to al-low any accommodation, including any already-proven-successful health and safety protocol, to reasonably accommodate both the health and readiness of the Marine Corps and the sincere religious belief of a fellow Marine.  What to make of that?

(One searches without success for a wholesome hypothesis that both accounts for these facts and complies with RFRA.)

Any reasonable, informed, and disinterested person looking at this improbably skewed result, especially a person familiar with the law, will acknowledge readily that the authority rendering this uniform course of rejection is highly unlikely to successfully demonstrate the *bona fides* of the process that produced this monolithic series of rejections. Perhaps (we shall see in due course) not all or even most of the requests for accommodations were in fact meritorious, but the lopsided probability is that certainly not all, probably not even substantially all, of the applications, already confirmed as religiously sincere by inquiring military chaplains, were justly and fairly denied an accommodation after a genuine "to the person" evaluation, which is explicitly demanded by RFRA. Is it more likely than not — in nearly all 3,733 cases — that no reasonable accommodation was available?

Presumably, even in the atmosphere of 2022 and on the highly charged subject of COVID-19, the law and the judges still can acknowledge the obvious, regardless of who is discomfited. Specifically in this instance and based on the current numbers, a reasonable jurist would conclude preliminarily (but always subject to a different conclusion on a complete record and after an adversarial evidentiary hearing) that the class of religiously objecting Marines is substantially likely to prevail on the merits of their claim that the Marines never received a fair and particularized evaluation "to the person," that is, never received the benefit of the process commanded by RFRA.

- 3 -

This action — an action by a class comprising Marines who harbor a religious objection to receiving the COVID-19 vaccine — addresses only the contention that unifies the class:  whether in late 2021 and throughout 2022 and before ordering Marines to accept a vaccination religiously repugnant (to the class) the Marine Corps asked the questions that RFRA demands and answered those questions in the manner — that is, "to the person" — that RFRA demands.  Because the record reveals the substantial likelihood of a systemic failure by the Marine Corps to discharge the obligations established by RFRA, a classwide preliminary injunction is warranted to preserve the status quo, to permit the full development of the record without prejudice to the plaintiffs, and to permit both a trial and a detailed, fact-based resolution of the controlling issues of fact and law.

## BACKGROUND[1]

On August 24, 2021, the Secretary of the Department of Defense (DoD) directed each branch of the military "to immediately begin full vaccination of all members of the Armed Forces under DoD authority on active duty or in the Ready Reserve, including the National Guard, who are not fully vaccinated against COVID-19."  (Doc. 1-4 at 1)  The directive states that "[t]hose with previous

---

[1] The original action, *Navy Seal 1 et al v. Austin et al*, 8:21-cv-2429-SDM-TGW (Doc. 1) comprised federal employees, federal contractors, employees of federal contractors, and service members in each branch of the military. An order (Doc. 89) in that action severs the non-service members, and a later order (Doc. 194) severs the service members by branch in recognition of related class actions on behalf of religiously objecting service members in the Navy, *U.S. Navy SEALs 1-26 v. Austin*, --- F. Supp. 3d ---, 2022 WL 1025144 (N.D. Tex. Mar. 28, 2022) (O'Connor, J.), and in the Air Force, *Doster v. Kendall,* No. 1:22-CV-84, 2022 WL 2974733 (S.D. Ohio July 27, 2022) (McFarland, J.). This action proceeds on behalf of the Marines only.

COVID-19 infection are not considered fully vaccinated." (Doc. 1-4 at 1) However, according to the Secretary's directive, the COVID-19 vaccination requirement remains "subject to any identified contraindications and any administrative or other exemptions established in Military Department policy," and each branch "may promulgate appropriate guidance to carry out the requirements set out above." (Doc. 1-4 at 1) The "other exemptions," to which the Secretary alludes, include a religious exemption supported by a specific statute, RFRA.

To implement the directive, the Marine Corps on September 1, 2021, issued MARADMIN 462/21, under which each active duty Marine must become fully vaccinated not later than November 28, 2021, and each Marine in a "reserve component" must become fully vaccinated not later than December 28, 2021. (Doc. 23-10 at 3) Under MARADMIN 612/21 3(a), if a Marine fails to timely begin COVID-19 vaccination, the Marine has "refused the vaccine" and is "processed" for administrative separation.

Under Marine Corps Order 1730.9, a Marine requesting a religious accommodation from COVID-19 vaccination must complete a religious accommodation form and interview with a chaplain, "who assesses whether the [applicant's] beliefs appear sincerely held." (Doc. 23-19 ¶ 12.a) The chaplain routes the assessment through the chain of command to the Deputy Commandant, Manpower and Reserve Affairs. (Doc. 23-19 ¶ 12.a) Marine Corps Order 1730.9 instructs the Deputy Commandant to resolve each initial request "on a case-by-case basis" and to "articulate the factual basis underlying their decision." The Deputy Commandant endeavors to resolve an

initial request within sixty days.  (Doc. 23-19 Ex. A ¶ 4.b)  The Marine receives written notice of the Deputy Commandant's decision and of  "any conditions or limitations placed on the approval to meet the compelling governmental interest in mission accomplishment."  (Doc. 23-19 Ex. A ¶ 4.b.4)

If the initial request is denied, the Marine can appeal to the Commandant of the Marine Corps, who (or whose delegate) decides the appeal.  (Doc. 23-19 Ex. A ¶ 4.c)  The applicable Marine Corps regulations state, "Decisions by an Appellate Authority are final."  (Doc. 23-19 Ex. A ¶ 4.c.1)  If the Commandant (or his delegate) denies the appeal (or if the Marine declines to appeal), the Marine receives an order to accept COVID-19 vaccination by a deadline, typically within two days to two weeks.  (*See, e.g.*, Doc. 141-2 at 21)  That is, a Marine denied after appeal must decide within days (as few as two days in some instances) whether to betray a religious conviction or confront court martial or separation.

The record reveals that by February 2022 the Marine Corps had denied 3,458 initial requests but granted no initial request and has finally denied 119 appeals and granted 3 appeals only (and only to those Marines eligible to, and electing to, retire).

(Doc. 73-4 at 3)[2]  By August 2022, the Marine Corps had granted only eleven of the 3,733 requests, less than three-tenths of a percent (0.295%).

Considering these denials, a February 13, 2022 order (Doc. 90) directs the military to submit for the Marine Corps, among other branches, a sample comprising (1) the twenty-five most recent appellate denials and (2) every grant of a religious accommodation.  The order permits the defendants "at their discretion" to submit "any other item in the administrative record of an applicant."

The submission confirms that the Marine Corps grants religious accommodations only to the rare applicant both eligible to, and electing to, retire.  In the instance of all other applicants, the Marine Corps in denying each appeal relies on an almost-identical letter, a template, a form rejection.  In denying the appeals, the letter invariably finds — even if the chaplain affirms the sincerity of the religious objection to the COVID-19 vaccine — that the COVID-19 vaccination requirement imposes no "substantial burden" on the applicant's Free Exercise.  And although each Marine's administrative record includes an "applicant information form" specifying the circumstances of the applicant's residence (for example, "11.  Does the applicant reside in the barracks?"), the applicant's work (for example, "15.  Does the applicant work primarily indoors?" and "16.  Can the applicant perform primary duties remotely?"), and the applicant's deployment status, among other things, the Marine Corps

---

[2] The reporting reveals a similar rate of denial in the other branches. By February 2022, the Navy has denied 3,728 initial requests but granted none and has denied 81 appeals but granted none. (Doc. 73-3 at 3)  The Air Force has denied 3,180 initial requests but granted 8 only and has denied 443 appeals but granted 1 only. (Doc. 73-5 at 4)

invariably finds — regardless of the answer to these questions — that no means less restrictive than COVID-19 vaccination protects the Marine Corps's interest in the health and readiness of the force.

The first paragraph of each appellate denial recites introductory matter, the second and third paragraph identify the applicant's religious objection, and the fourth paragraph describes the procedural history. The "adjudicative" paragraphs state with minimal variation and in boilerplate fashion:

> 5. I have determined that the COVID-19 vaccination require-ment does not substantially burden your sincerely held religious belief because fetal stem cells are neither used in the manufac-ture of the Pfizer COVID-19 vaccine nor are they present in the vaccine itself.

> 6. Nonetheless, even assuming that the COVID-19 vaccination substantially burdens your religious beliefs, I have considered, in accordance with references (b) and (e), your assertions con-cerning your beliefs and weighed them against the govern-ment's compelling interests in military readiness and in the health and safety of the force. The COVID-19 vaccine is the most effective and readily available tool the Marine Corps has to keep service members healthy and safe, and to ensure that the Marine Corps continues to be able to accomplish its mission of protecting vital national interests. Service members who are fully vaccinated have significantly less risk of hospitalization, severe disease, and death. The Marine Corps has seen increas-ingly convincing data that service members who remain unvac-cinated are more likely to experience a wide range of new, re-turning, or ongoing health problems known as "long COVID" after being infected with COVID-19 as opposed to those who are fully vaccinated. Further, emerging variants, such as the Omicron variant, which is highly transmissible, pose additional concerns. Personnel who have fallen ill due to a failure to be vaccinated against COVID-19 undermine a unit's effective functioning and negatively impact their unit's ability to accom-plish the mission. Moreover, personnel who are unvaccinated do not just put themselves at risk, they also risk the health and medical readiness of other persons within their unit, which in turn decreases the military readiness of the unit and the Marine Corps as a whole. For a unit to function effectively, either in

garrison, in field training, or in combat, all personnel must be able to perform their individually assigned duties, which ensures military readiness, another of the government's compelling interests. As a result, an exemption from the COVID-19 vaccination poses a significant risk to military readiness, and the health and safety of the force, particularly in your case, where you work primarily indoors, in close proximity to others, and you cannot perform your duties remotely. Additionally, you are attached to a deployable unit and you participate in unit training that requires you to be in close proximity to other Marines. Finally, you are required to be worldwide deployable at a moment's notice.

7. Your claim that testing for COVID-19 antibodies, masking, and social distancing are less restrictive means is not supportable because these means are less effective than vaccination and they do not achieve the Marine Corps' compelling government interest in readiness, and health and safety. While masking, social distancing, hygiene, teleworking, and other similar measures, individually or in combination, have been shown to help slow the spread of the virus, they are simply not as effective as vaccination, particularly against the Omicron variant. Moreover, these measures are often incompatible with the demands of military life, where Marines and Sailors must live, work, realistically train, and, if necessary, fight in close quarters. The demands of military life render these less restrictive means of furthering the government's compelling interests in military readiness and the health and safety of the force even less effective than such measures among the civilian community. Accordingly, because there are no less restrictive means to ensure these compelling government interests, your appeal is disapproved.[3]

These boilerplate letters have denied, for example, a request from (1) a Marine who "works in an office by himself" supervising "social media accounts" and creating internet content (Doc. S-109-4 at 102), (2) a Marine who "works with one other individual" in a one-thousand-seven-hundred square foot area and whose "daily

---

[3] (Compare Doc. S-109-2 at 17, with Docs. S-109-3 at 6–7, 30–31, 61–62, 95–96; S-109-4 at 20–21, 58–59, 83–84, 115–16, 167–68, 210–11; S-109-5 at 27–28, 53–54, 84–85, 152–53, 179–80, 208–09; S-109-6 at 16–17, 44–45, 75–76, 174–75, 207–08; and S-109-7 at 8–9, 41–42).

operations can be (and currently are) accomplished via telework" (Doc. S-109-4 at 198), (3) two Marines who work as a graphic specialist at a computer "in a private office with one other Marine" (Doc. S-109-5 at 26, 151, 166), (4) a Marine on "limited duty status" and "currently executing Separations Orders . . . for medical evaluation and release from service" (Doc. S-109-6 at 32), and (5) a Marine who "works in an office with four other Marines over six feet apart" and who is not attached to a deployable unit (Doc. S-109-7 at 89–90).

After these final denials, several orders in this action granted preliminary injunctive relief on behalf of three plaintiff Marines finally denied a religious accommodation despite a religious objection to COVID-19 vaccination.  Contemporaneous with the issuance of preliminary injunctive relief on behalf of the three Marine plaintiffs in this action, a district court in the Northern District of Texas certified a class comprised of, and issued a preliminary injunction on behalf of, religiously objecting service members in the Navy.  *U.S. Navy SEALs 1-26 v. Austin*, --- F. Supp. 3d ---, 2022 WL 1025144 (N.D. Tex. Mar. 28, 2022).  Similarly, a district court in the Southern District of Ohio certified a class comprising religiously objecting service members in the Air Force and soon after granted a classwide preliminary injunction.  *Doster v. Kendall,* No. 1:22-CV-84, 2022 WL 2974733 (S.D. Ohio July 27, 2022).

## DISCUSSION

Count II under the First Amendment challenges the Marine Corps's implementation of the vaccination requirement and Count III under RFRA challenges the Marine Corps's vaccination requirement.  Because for a service member RFRA

"provide[s] greater protection . . . than is available under the First Amendment," *Holt v. Hobbs*, 574 U.S. 352, 357 (2015) (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694–95 (2014)), the RFRA claim demands primary consideration (after all, if a Marine's RFRA claim fails, the Marine's First Amendment claim necessarily fails).[4]

The motion (Doc. 35) for class certification is fully briefed (Doc. 42) and resoundingly supplemented (Docs. 113, 146, 166, 176, 190).  The motion (Doc. 2) for a classwide preliminary injunction is fully briefed (Doc. 23) and resoundingly supplemented (Docs. 30, 51, 74, 104, 113, 146, 166, 176, 206).

## I.  Justiciability

The Marine Corps contends that the plaintiffs' RFRA claims against the military lack justiciability in federal court and remain unripe for lack of administrative exhaustion.  The resolution of justiciability must precede the assessment of the motion for class certification and the motion for preliminary injunction.

A.   <u>RFRA secures in federal court a claim against the military</u>.

RFRA was a bi-partisan enactment (although in 1993 the President, the Speaker of the House, and the Majority Leader in the Senate were Democrats).  Specifically, two months after then-Representative Charles Schumer (and more than one-hundred other representatives, both Republicans and Democrats) introduced RFRA, H.R. 1308, 103d Cong. (1993), the House of Representatives passed the bill by a two-thirds voice vote.  139 Cong. Rec. 9,687 (1993).  The Senate amended the

---

[4] An earlier order (Doc. 40) denies a preliminary injunction on Count I, a claim under the Food, Drug, and Cosmetic Act.

bill and passed the amended version by a vote of 97 yeas to 3 nays.  139 Cong. Rec.

26,416.  After unanimously consenting to the Senate's amendment, 139 Cong. Rec.

27,241, the House presented RFRA to President Clinton on November 5, 1993.  139

Cong. Rec. 32,215.  President Clinton promptly signed RFRA.

In addition to the fealty perennially owed a duly enacted statute, RFRA war-

rants heightened and focused attention and diligent compliance by the government,

including the military, and discerning enforcement by the courts.  Enjoying singu-

larly bi-partisan support, RFRA expressly restores against intrusion by the federal

government the protection for Free Exercise suddenly eroded by the Supreme Court

in *Employment Division v. Smith*, 494 U.S. 872 (1990).[5]  Entrusted with a now-more-

specific and customized statutory remedy, the courts must take care not to, for the

second time and athwart the statute, withdraw or diminish the protection for Free

Exercise that is restored by this pointedly and purposefully created statute.  When

Congress acts to preserve liberty, especially a liberty historically and constitutionally

fundamental to the United States, the courts — the intended preserve of liberty —

must not evade or equivocate, must not, so to speak, sacrifice the fundamental right

of thousands of privates to Free Exercise in order to gratify the preference of a few

generals.

---

[5] *Smith* decisively (and—to Congress—objectionably) departed from, and sharply confined, the seemingly settled and longstanding constitutional law exemplified by *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). A detailed account of the pertinent history of the Supreme Court's Free Exercise opinions and Congress's prompt enactment of RFRA appears earlier in this action at Doc. 40, pp. 8–20, and Doc. 111, pp. 16–29.

RFRA requires that the federal government bear the burden of answering some statutorily prescribed questions, including by demonstrating that a compelling governmental interest requires the proposed action and that no less restrictive means is available to permit both the reasonable accommodation for Free Exercise and the reasonable preservation of the compelling interest. The statutorily stated purpose of RFRA, 42 U.S.C. § 2000bb, is "(1) to restore the compelling interest test . . . in all cases where free exercise of religion is substantially burdened[] and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government." To enable those, including Marines, whose Free Exercise is improperly restricted to pursue RFRA's statutory remedy, RFRA amends 42 U.S.C. § 1988, the Civil Rights Attorney's Fees Awards Act of 1976, Public Law 94–559, to allow in a RFRA action an award to the prevailing party, other than the United States, of a reasonable attorney's fee and costs, including expert witness fees. RFRA includes specific and unequivocal commands to the government, defined to include every "branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." Obviously, RFRA includes everyone from the President to a park ranger, from the Chief Justice of the United States to a probation officer, from the Speaker of the House to a member's district office staffer, from the Chairman of the Joint Chiefs of Staff to a military recruiter — even if they don't like it and even if they don't agree with it. The Free Exercise Clause and RFRA are the law of the land.

Among RFRA's express and explicit findings are that the government "should not substantially burden religious exercise without a compelling justification" and that the "compelling interest test" that RFRA restores is a "workable test" that demands "striking a sensible balance between religious liberty and competing prior governmental interests." With the notions of a "workable test" and a "sensible balance" featured conspicuously, the statute proscribes any substantial burden on Free Exercise unless the government "demonstrates" (a statutorily defined term) that the substantial burden (1) "is in furtherance of a compelling governmental interest" and (2) "is the least restrictive means of furthering that compelling governmental interest." Explaining that the government must meet a "burden of proof," RFRA defines "demonstrates" as "meets the burdens of going forward with the evidence and of persuasion." That burden is the same for preliminary injunctive relief.

Thus, RFRA secures for a Marine (and any service member) a claim against the military for violation of Free Exercise. Article I, Section 8, Clause 14 of the Constitution vests Congress with the plenary authority "[t]o make Rules for the Government and Regulation of the land and naval Forces[.]" By enacting RFRA, Congress exercised this plenary authority to guarantee the "broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014). To ensure comprehensive protection of Free Exercise, Congress under 42 U.S.C. § 2000bb-2(1) extends RFRA to govern any substantial burden imposed by a "branch, department, agency, instrumentality, and official (or other person acting under color of law) of

the United States."  No exemption, whether express or implied, relieves the military

of RFRA's command.[6]

Further, RFRA expressly creates a remedy in district court.  Entitled "Judicial

Relief," 42 U.S.C. § 2000bb-1(c), allows "[a] person whose religious exercise has

been burdened in violation of this section" to "assert that violation as a claim or de-

fense in a judicial proceeding and obtain appropriate relief against a government."

RFRA includes no administrative exhaustion requirement and imposes no jurisdic-

tional threshold.  No exemption, whether express or implied, insulates a military in-

fringement of Free Exercise from review in the district court.

Explaining RFRA's application to the military, *Singh v. McHugh*, 185 F. Supp.

3d 201, 217–18 (D.D.C. 2016), observes:

> RFRA applies to the "government," which is defined to include
> a branch, department, agency, instrumentality, and official (or
> other person acting under color of law) of the United States."
> 42 U.S.C. § 2000bb–2(1). So, on its face, the statute plainly ap-
> plies to the U.S. Army. And defendants acknowledge that Con-
> gress specifically intended RFRA to apply to the military. Hr'g
> Tr. at 35; see also S. Rep. No. 103–111, at 12 (1993) ("Under

--------

[6] "[C]ourts must—at least initially—indulge the optimistic presumption that the military will afford its members the protections vouchsafed by the Constitution, by the statutes, and by its own regulations." *Hodges v. Callaway*, 499 F.2d 417, 424 (5th Cir. 1984). But that deference "does not jus-tify the abdication of the responsibility, conferred by Congress, to apply [a statute's] rigorous stand-ard." *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). *Holt* charges that the Religious Land Use and Institu-tionalized Persons Act—RFRA's "sister statute"—"does not permit such unquestioning deference" to a decision by a prison official even if that decision affects health, safety, good order, and disci-pline. *Holt*, 574 U.S. at 364. The defendants cite no authority—governing or persuasive—to suggest that a military personnel decision allegedly violative of RFRA enjoys immunity from judicial re-view. To the contrary, determining whether a government official's action contravenes a statutory directive is singularly within the expertise of a district court. See *Holt*, 574 U.S. at 866 (emphasizing that RLUIPA "demands much more" than deferring to an official's "mere say-so that they could not accommodate petitioner's request"); *Harmon v. Brucker*, 355 U.S. 579, 582 (1958); *Emory v. Sec'y of Navy*, 819 F.2d 291, 294 (D.C. Cir. 1987); *Dilley v. Alexander*, 603 F.2d 914, 920 (D.C. Cir. 1979) ("It is the duty of the federal courts to inquire whether an action of a military agency conforms to the law[.]"); *Singh v. McHugh*, 185 F. Supp. 3d 201, 218–22 (D.D.C. 2016); *Heap v. Carter*, 112 F. Supp. 402 (E.D. Va. 2015).

> the unitary standard set forth in [RFRA], courts will review the free exercise claims of military personnel under the compelling governmental interest test."); H.R. Rep. No. 103–88 (1993) ("Pursuant to the Religious Freedom Restoration Act, the courts must review the claims of prisoners and military personnel under the compelling governmental interest test.")

Despite the unmistakable message of the Free Exercise Clause, RFRA, and decisions applying RFRA, such as *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), the Marine Corps repeatedly argues as if none of the three exists (or, at least, as if none of the three affects the command discretion of the Marine Corps). The Marine Corps persistently and resolutely clings to the belief that their accustomed and unfettered command discretion need not yield — on the narrow and specific question of Free Exercise — to the statutory command of RFRA or to an order under RFRA from a district court (actually, at this moment, orders from several district courts), the forum selected by Congress and enacted in RFRA to resolve a dispute under RFRA (in other words, Congress and the President, not the district court, chose the district court as the proper forum for service members to assert the RFRA claim asserted in this action). The Marine Corps repeatedly asserts, "The Supreme Court has made clear: 'Judges are not given the task of running the Army,'" a quote from *Orloff v. Willoughby*, 345 U.S. 83, 93 (1953), a dispute resolved forty years before the enactment of RFRA. Although certainly not "given the task of running the Army," the courts in the narrow instance of RFRA are assigned to, and entrusted to, ensure that those who run the Marine Corps (and the military in general and every other component of the federal government) conform their actions to the governing law, to RFRA, to which the admirals and the generals and the

commandants are unquestionably subordinate — just like the President, the Speaker of the House, the Chief Justice, and every other person in the federal government. To repeat:  Yes, Congress and the President, not the courts, govern the military.  But Congress and the President in governing the military and by enacting RFRA have established — for the narrow category of Free Exercise — an action and a remedy in the district court, have specified and placed the burden of proof on the military, and have allowed for an "appropriate remedy" to ensure a service member's Free Exercise.  That conclusion is not fairly contestable, and the military must acquiesce to the command of Congress and the President in that respect.  A service member can sue in a district court to enjoin a violation of RFRA.[7]  And the pursuit of relief from a systemic deprivation of Free Exercise, preserved and protected by RFRA, presents a claim uniquely susceptible to resolution in the district court.  This order and this action will proceed accordingly.

B.    The plaintiffs present a ripe claim.

The Marine Corps argues that the plaintiffs' RFRA claim — even if justiciable in federal court — remains unripe for lack of administrative exhaustion.  Generally, an action against the military requires administrative exhaustion — a "prudential,

---

[7] According to *Speigner v. Alexander*, 248 F.3d 1292, 1295 n.5 (11th Cir. 2001), the test in *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971), no longer determines justiciability in actions by service members against the military for a claim "based on an injury incident to service." *See also Doe v. Garrett*, 903 F.2d 1455, 1463 n.15 (11th Cir. 1990) ("[I]t appears well established that *Mindes* need not be applied before reaching the merits of a statutory claim against the military."); *but see Stinson v. Hornsby*, 821 F.2d 1537, 1540–41 (11th Cir. 1987) (remanding case against the military to district court to apply *Mindes* factors). If the *Mindes* factors govern justiciability, the *Mindes* test is thoroughly and convincingly satisfied for the reasons stated in *Air Force Officer v. Austin*, 5:22-cv-00009-TES (M.D. Ga. Feb. 15, 2022), and *U.S. Navy SEALs 1–26 v. Biden*, --- F. Supp. 3d ---, 2022 WL 34443 (N.D. Tex. Jan. 3, 2022), and throughout this action.

and not jurisdictional" component of ripeness. *Winck v. England*, 327 F.3d 1296, 1300 (11th Cir. 2003), *abrogated on other grounds as recognized in Santiago-Lugo v. Warden*, 785 F.3d 467 (11th Cir. 2015). As *Winck* confirms, abstention to the military is a judge-made doctrine grounded in comity. But "RFRA 'operates as a kind of super statute, displacing the normal operation of other federal laws[.]'" *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 346 (5th Cir. 2022) (quoting *Bostock v. Clayton County*, 140 S. Ct. 1731, 1754 (2020)). "It would not be a stretch to conclude that RFRA must also displace a judge-created abstention doctrine" in favor of the military. *U.S. Navy Seals 1-26*, 27 F.4th at 346. "[W]hen Congress addresses a question previously governed by a decision rested on federal common law[,] the need for such an unusual exercise of lawmaking by federal courts disappears." *City of Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981).

In any event, each member of the class has exhausted the administrative remedy. Each member of the class applied for a religious accommodation, was denied a religious accommodation, timely appealed the denial of the religious accommodation, and was denied (or imminently will be denied) after appeal. And under Marine Corps Order 1730.9, the "[d]ecisions by an Appellate Authority" adjudicating a religious accommodation "are final." (Doc. 23-19 Ex. A ¶ 4.c.1) Accordingly, under the Marine Corps's regulations, the proposed class has exhausted the administrative remedy and need pursue no other internal remedy before suing in federal court to acquit their right to Free Exercise as guaranteed by RFRA. To the extent that administrative exhaustion remains a requirement despite the enactment of RFRA, which

- 18 -

imposes no exhaustion or other pre-suit requirement, the class has fully exhausted the requirement by pursuing a religious accommodation through finality.

Resisting the avowed "finality" of the denial of an appeal, the Marine Corps contends that a Marine unlawfully denied a religious accommodation can petition the Review Board during the Marine's separation proceedings and can petition the Board for Correction of Naval Records after discharge.  But "'exhaustion is not required where . . . irreparable injury will result if the complaining party is compelled to pursue administrative remedies[] or an administrative appeal would be futile.'" *Winck*, 327 F.3d at 1304 (quoting *Linfors v. United States*, 673 F.2d 332, 334 (11th Cir. 1982)).  Even if either board has the power to override the "final" denial of a religious accommodation (nothing in the record suggests this power), each internal remedy becomes available only after the Marine has received a final denial, only after the Marine has violated the accompanying order to accept vaccination, and only after a separation proceeding has begun against the Marine.  And, as explained in section III.C, a Marine unlawfully denied a religious accommodation and ordered to accept vaccination (often by an acutely abbreviated deadline) suffers immediate, irreparable harm to Free Exercise even if an administrative mechanism might afford some relief in the future.  Thus, even if the burden of administrative exhaustion remains despite RFRA and despite the Marines pursuing the religious accommodation through the "finality" of the process, the irreparable harm exception to administrative exhaustion

attaches, the claim is ripe, and an action and remedy lie immediately in federal court.[8]

## II.  Class certification

### A.    The type of class

Construed with the benefit of several hearings, the motion (Doc. 35) pursues certification of a class comprising religiously objecting Marines who received a chaplain's affirmation of sincerity, who applied for a religious accommodation from COVID-19 vaccination, who were denied an accommodation, and who timely appealed the denial, and who were or will be denied with finality after appeal and ordered to accept COVID-19 vaccination.  This analysis addresses the "type[] of class action" under Rule 23(b) before addressing the other pre-requisites to certification under Rule 23(a).

The traditional vehicle to vindicate the widespread deprivation of civil rights, including the deprivation of Free Exercise, Rule 23(b)(2) permits the maintenance of a class action "if . . . the party opposing the class has acted or refused to act on grounds applying throughout the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"  "Rule 23(b)(2) has been liberally applied in the area of civil rights."  *Bumgarner v. NCDOC*, 276 F.R.D.

---

[8] Also, the near unanimous denial of every appeal reveals a substantial likelihood that other administrative remedies are futile. *Winck*, 327 F.3d at 1304 (affirming that in military actions futility remains an exception to administrative exhaustion). And the resort to two-day warnings of discharge (and, in the instance of First Lieutenant and undoubtedly others, suddenly charging daily rent of more than $100 to remain in military housing while packing one's family and searching for civilian housing) suggests retribution and retaliation, the existence of which detracts from the Marine Corps's claim elsewhere in this action to good faith treatment of a religious objector.

452, 457 (E.D.N.C. 2011) (Boyle, J.); Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1776 (3d ed.) (discussing the range of civil-rights actions certified pursuant to Rule 23(b)(2) and explaining that "the class suit is a uniquely appropriate procedure in civil-rights cases").

Rule 23(b)(2) presents two express requirements.  First, the Marine Corps must have acted or failed to act on grounds that apply generally to the class.  The plaintiffs contend that the record reveals in the Marine Corps a systemic failure — in violation of RFRA — to conduct an individualized assessment of each sincerely objecting Marine, to consider the suitability of a compromise accommodation, and to consider the feasibility of relaxing for each applicant the requirement of deployability.  In other words, the plaintiffs challenge not the correctness of the legal or factual sufficiency of any particular denial but challenge both the common but allegedly deficient process on which the Marine Corps relies in denying the requests uniformly and *en masse* and the allegedly inflexible, conclusory, vague, and overbroad rationalizations used by the Marine Corps in uniformly refusing accommodation.  The plaintiffs' contentions accord comfortably with the purpose and design of Rule 23(b)(2). *Brown v. Plata*, 563 U.S. 493, 532 (2011) (observing that Rule 23(b)(2) is especially suited to remedy "systemwide violation[s]" resulting from "systemwide deficiencies."); s*ee also*, *U.S. Navy SEALs 1-26 v. Austin*, --- F. Supp. 3d ---, 2022 WL 1025144 (N.D. Tex. Mar. 28, 2022) (certifying under Rule 23(b)(2) a class of religiously objecting service members in the Navy); *Doster v. Kendall,* No. 1:22-CV-84, 2022 WL 2974733 (S.D. Ohio July 27, 2022) (granting classwide preliminary relief "due to the

systematic nature of what the Court views as violations of Airmen's constitutional rights to practice their religions . . . .")

Further, the plaintiffs contend persuasively (on the present record) that the denial of each of the thousands of requests for religious accommodation confirms that the Marine Corps is subject to a systemic deficiency manifesting the organized disregard of RFRA. As the late Richard Nagareda observes:

> If the wrong of the defendant comes into focus only when one looks at the situation in the aggregate, then it would seem odd for the procedural mode of the litigation to take anything other than a commensurately aggregate form. In this regard, the argument for class certification starts to resemble the "core" justification for class treatment—to make marketable as an aggregate unit claims that would not be marketable individually. With respect to situations of both aggregate proof and unmarketable claims—especially when those two features coincide—the very real fear is that, absent aggregate procedure, a wrong of considerable significance in the aggregate will go unremedied.

Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 124 (2009).[9]

Viewed in isolation, the erroneous denial of an accommodation for a particular religiously objecting Marine reveals no more than the erroneous denial for that Marine. But fixation on the plight of a particular religiously objecting Marine (or on only the Marines appearing as plaintiffs) diverts attention from the systemic deficiency under which the Marine Corps's religious accommodation procedure apparently labors. Because in this action the wrong in the aggregate suggests strongly and includes a wrong in the particular, the class is especially suitable for certification

---

[9] In the context of the article, "marketable" means economically feasible.

under Rule 23(b)(2).  *See Doster*, 2022 WL 2760455 ("Because Defendants have uniformly maintained a policy of overriding Airmen's religious objections to the COVID-19 vaccine, they have acted 'on grounds that apply generally to the class.'")

Second, a Rule 23(b)(2) class must primarily pursue declaratory and injunctive relief — not damages.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362–363 (2011).  The class pursues declaratory and injunctive relief only.

Opposing class certification under Rule 23(b)(2), the Marine Corps principally argues that the denial of a religious accommodation "is highly fact-specific" and requires, among other things, an examination "with respect to each and every class member whether, in light of their roles, job responsibilities, and workplaces, the government may use any means less restrictive than vaccination to advance its compelling interests in preventing the spread of the virus . . . ."  (Doc. 42 at 16)  But the Marine Corps in that argument opposes a case that has not been brought and a motion that is not pending.

The specific issue that unifies the class is the organized, purposeful, and systemic failure to resolve the requests for a religious accommodation in accord with the burden imposed by RFRA.  A favorable outcome on the "particular issue," common among, and typical of, the class resolves not an ancillary or academic aspect of the class members' claim against the Marine Corps but resolves a central issue — whether the Marine Corps has systematically failed to discharge the burden of proof and other requirements under RFRA.

B.   <u>The pre-requisites to certification</u>

Under Rule 23(a), Federal Rules of Civil Procedure, "One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

But before assessing each requirement of Rule 23(a), "a district court must determine that a proposed class is 'adequately defined and clearly ascertainable.'" *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021). An ascertainable class exists "if it is adequately defined such that its membership is capable of determination." *Cherry*, 986 F.3d at 1304. "A class is not ascertainable unless the class definition contains objective criteria that allow for class members to be identified in an administratively feasible way. Identifying class members is administratively feasible when it is 'a manageable process that does not require much, if any, individual inquiry.'" *Karhu v. Vital Pharms., Inc.*, 621 Fed. Appx. 945, 946 (11th Cir. 2015) (citing *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 Fed. Appx. 782, 787 (11th Cir. 2014)).

The Marine Corps argues that RFRA applies only if the objector harbors a sincere religious belief and argues that sincerity of belief is subjective and incapable of ascertainment by objective criteria. Although the identification of a Marine harboring a sincere religious objection to COVID-19 vaccination might present difficulties in other instances (the sincerity of belief is, of course, necessarily an individualized

- 24 -

determination), the record in this action presents an objective method of ascertainment. As a requirement of applying for a religious accommodation, each Marine must interview with a chaplain, who assesses whether the "Requester's beliefs (conscience, moral principles, or religious beliefs) seemed honestly and sincerely held." Each chaplain must complete this checklist:

| Yes | No | N/A | Interview |
|---|---|---|---|
| | | | Requester's beliefs (conscience, moral principles, or religious beliefs) seemed honestly and sincerely held using one or more of the following factors: |
| | | | 1. Requester was credible (consistently keeps tenets, practices, etc.). |
| | | | 2. Requester's demeanor and pattern of conduct are consistent with the request. |
| | | | 3. Requester participates in activities associated with the belief(s). |
| | | | 4. Other persons supporting the claim are credible. |
| | | | 5. Request is supported by letter(s) of verification or endorsement from an organization espousing the beliefs which are the basis for the claim. |
| | | | Alternate means of accommodating the practice were explored in the interview. |

(Doc. 23-19 at 32). Accordingly, the record presents an objective method — readily ascertainable by the Marine Corps — to identify each sincerely objecting applicant.[10]

Also, the Marine Corps argues that "it remains unclear which named 'class representatives' will be in the class" because the appeals of some plaintiffs remain pending. (Doc. 206 at 2) But most of the plaintiffs have received the final denial of an appeal and the accompanying order to accept COVID-19 vaccination and thus are readily ascertainable as class representatives.

---

[10] Although a Marine lacking a chaplain's affirmation of sincerity is outside the class, the existence of this class creates no barrier to that Marine's suing under RFRA in a federal court of appropriate venue and pursuing a challenge that the Marine Corps erred by finding the Marine insincere.

1.     Numerosity

"While there is no fixed numerosity rule, generally [fewer] than twenty-one is inadequate, more than forty is adequate, with numbers in between varying according to other factors." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). "Rule 23(a)(1) imposes a 'generally low hurdle,' and a plaintiff need not show the precise number of members in the class.'" *Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 514 (S.D. Fla. 2013) (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009)).  The Marine Corps has denied with finality hundreds of appeals from religiously objecting Marines; thus the class is sufficiently numerous.  The continual growth of this class further undermines the practicability of joinder and thus demonstrates "that the class is sufficiently numerous." *Gonzalez v. Sessions*, 325 F.R.D. 616, 622 (N.D. Cal. 2018), *aff'd sub nom. Gonzalez v. Barr*, 955 F.3d 762 (9th Cir. 2020).

2.     Commonality

To satisfy commonality, the class claims "must depend upon a common contention of such a nature that it is capable of classwide resolution — which means that the determination of its truth or falsity will resolve an issue central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. 338, 350 (2011).

> 'What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the

> proposed class are what have the potential to impede the gener-
> ation of common answers.'

*Dukes*, 564 U.S. at 350 (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–32 (2009).[11]

The record presents two questions common to the class:  (1) does the uniform denial of requests for a religious accommodation and other evidence reveal a policy-in-fact of denying all religious accommodations except for the rare Marine both elect-ing to, and eligible to, retire (and, perhaps, excepting a smattering of other trivial in-stances) and (2) does the analysis — uniformly applied to every applicant — used by the Marine Corps fail to conform to the analysis required by RFRA?  If the answer to either question is "yes," the Marine Corps has failed to discharge the burden that RFRA demands and cannot impose the COVID-19 vaccination requirement against the class.  *See Doster*, 2022 WL 2760455, *4 (observing that "the putative class mem-bers face the same injury: violation of their constitutional freedom by Defendants' clear policy of discrimination against religious accommodation requests.").

3.    Typicality

"[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large."  *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1322 (11th Cir. 2008).  "Although typicality and commonality may be related, we have distinguished the two concepts by noting that,

---

[11] But unlike *Dukes*, in which a putative class challenged the allegedly discriminatory pay practices of autonomous Wal-Mart managers scattered throughout the United States, a Marine de-nied a religious accommodation appeals directly to the Commandant of the Marine Corps, and the appeal is resolved by a centralized designated cadre of Assistant Commandants.

'[t]raditionally, commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the named plaintiff in relation to the class.'" *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1275 (11th Cir. 2009) (quoting *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001)). With respect to the "particular issue" of the Marine Corps's failure to conduct the analysis required by RFRA, the named plaintiffs are typical:  each has applied for a religious accommodation and has appealed or will appeal the denial of a religious accommodation, and each has received, or is likely to imminently receive, a denial. Although factual differences about the conditions of service persist, "a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 n.14 (11th Cir. 2000).  That each Marine might have a basis to challenge on atypical grounds the rejection of an accommodation is not inconsistent at all with each Marine's having another basis, common to all, to challenge the denial.  *See Doster*, 2022 WL 2760455, *6 ("The typicality of the putative class is reflected in the fact that [the Air Force has] indiscriminately denied almost all religious accommodation requests and their use of form letters to deny the accommodation requests.")

4.     Adequacy of representation

The plaintiffs lack a "substantial conflict of interest" with the rest of the class and the record shows the plaintiffs' ability and willingness to resolutely prosecute this action.  Accordingly, the plaintiffs can fairly and "adequately protect the interests of [the class]." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir.

2003).  The Marine Corps speculates that counsel likely "selected" plaintiffs with a stronger claim than absent class members.  (Doc. 206 at 5)  But nothing in the record suggests the inadequacy of any the class representatives to pursue the claim that unifies the class.

Also, to appoint class counsel under Rule 23(g)(1)(A), Federal Rules of Civil Procedure, a district court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class[.]

The plaintiffs' lawyers — Mathew D. Staver, Roger K. Gannam, Daniel J. Schmid, Horatio G. Mihet, and Richard L. Mast, Jr., — are able, experienced, and successful constitutional and civil rights litigators.  Mihet declares (Doc. 35-1) that the lawyers' experience includes representing plaintiffs who allege violation of religious liberties, advocating for citizens who harbor a religious objection to the COVID-19 vaccine, and managing class and other complex litigation.  As demonstrated by the record, the plaintiffs' lawyers have dedicated substantial resources to identifying and investigating claims on behalf of the class.  The Marine Corps contests neither the ability nor experience of the lawyers, who show a willingness to commit the attention required and to dedicate the resources necessary for adequate class representation.

### III.  Motion for classwide preliminary injunction

A preliminary injunction issues only if the movant shows (1) a substantial likelihood of success on the merits, (2) a substantial likelihood of irreparable injury

- 29 -

absent an injunction, (3) an imbalance of equities favoring the movant, and (4) an unlikelihood of the injunction's injuring the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

A.    <u>Substantial likelihood of success on the merits</u>

Under RFRA, codified at 42 U.S.C. § 2000bb-1, the federal government can substantially burden sincere Free Exercise only if the government demonstrates that "application of the burden to the person" both "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

RFRA's focus on "the burden to the person" forecloses generalizations about the government's interest and generalizations about the absence of less restrictive means. The government must discharge both components of RFRA's burden "through application of the challenged law 'to the person' — the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 727–28 (2014) (emphasizing that a court must "'loo[k] beyond broadly formulated interests' and to 'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants'") (alterations in original) (quoting *O Centro*, 546 U.S. at 431). That is, a district court must not defer to an official's "mere say-so that [the official] could not accommodate" a request. *Holt v. Hobbs*, 574 U.S. 352, 369 (2015). RFRA demands a "more focused" inquiry and requires scrutiny of the "'marginal interest in enforcing' the challenged

government action in that particular context." *Holt*, 574 U.S. at 363 (citing *Hobby Lobby*, 573 U.S. at 726–27). Accordingly, RFRA exceeds the pre-*Smith* protection of Free Exercise. *City of Boerne v. Flores*, 521 U.S. 507, 535 (1997) (holding that RFRA "imposes in every case a least restrictive means requirement — a requirement that was not used in the pre-*Smith* jurisprudence RFRA purported to codify"); *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 475 (5th Cir. 2014) (holding that RFRA's requiring the least-restrictive means "is a severe form of the 'narrowly tailored' test").

Also, the government's burden of proof in opposing a preliminary injunction tracks the government's burden at trial. *O Centro*, 546 U.S. at 429. RFRA "squarely" places the burden on the government to demonstrate a compelling interest achieved through the least restrictive means. *O Centro*, 546 at 429–30 (citing *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 666 (2004) (affirming the grant of a preliminary injunction because the government failed to satisfy the burden of proof)). Accordingly, the plaintiffs "must be deemed likely to prevail unless the Government has shown that [the plaintiffs'] proposed less restrictive alternatives are less effective" than the burden imposed by the government. *Ashcroft*, 542 U.S. at 666. Showing that the challenged action has "some effect" on achieving a governmental interest is insufficient. *Ashcroft*, 542 U.S. at 666; *O Centro*, 546 U.S. at 418.

Viewed from a different vantage, RFRA requires in practice that the Marine Corps articulate — that is, display for informed review — the Marine Corps's calculation of the extent of the adverse effect on the health and readiness of the force that

results from allowing a particular Marine to faithfully observe the Marine's sincere religious belief while serving any reasonable health and safety practice the Marine Corps might prescribe and explain why incurring that marginal adverse effect unacceptably impairs some compelling governmental interest.

1.   The COVID-19 vaccination requirement substantially burdens the class members' Free Exercise.

A direct order to accept the injection of a substance against which a Marine harbors a sincere religious objection substantially burdens Free Exercise. *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972) (finding the existence of a substantial burden "inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs"); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069–70 (9th Cir. 2008) (explaining that a "substantial burden" exists if a person is "coerced to act contrary to their religious beliefs by threat of civil or criminal sanctions").

Although Marines of different faiths, different education, and different acumen might understand or explain this objection differently and with more or less clarity, many Marines, including Christians and Muslims, object that the COVID-19 vaccine was developed from cell lines derived from electively aborted fetuses and that introducing an mRNA-active substance into their body either desecrates their body, a temple of the Holy Spirt, or is *haram*, forbidden.  In any case, neither the military nor the judiciary can judge the validity of a religious objection (unless the objection is irrational, delusional, or the like) — but can judge only the sincerity of the

belief, which is demonstrated firmly in the administrative record by the chaplain's assessment of sincerity. (Again, because a Marine lacking a chaplain's affirmation of sincerity is not a member of the class, this order affords relief only to those Marines for whom the chaplain has affirmed the sincerity of belief.)

Notwithstanding a chaplain's affirmation, the Marine Corps rejects as insubstantial any religious objection grounded in the vaccine's connection to aborted fetal tissue because "fetal stem cells are neither used in the manufacture of the Pfizer COVID-19 vaccine nor are they present in the vaccine itself." This "finding," a unilateral lay declaration about a much-discussed and much-debated topic, says nothing about the use of aborted fetal cells in the development of the vaccine and this finding says nothing about (and can say nothing about) the theological consequences of that use or about either moral or factual uncertainty. The "finding" says nothing about the religious concepts of, for example, accepting a personal benefit from evil, assisting someone in profiting from evil, cooperating in evil, appropriation of evil, de-sensitization to evil, moral contamination by intimacy with evil, ratification of evil, complicity with evil, or other considerations undoubtedly familiar to a theologian and likely familiar to a thoughtful and religious lay person who has contemplated evil.

The Marine Corps's blanket rejection of RFRA's burden confuses the sincerity inquiry with the substantial burden inquiry, which further reveals the systemic failure under which the Marine Corps's resolution of religious accommodations labors. Of course, the injection into the body of a substance against which the recipient harbors

a sincere religious objection is morally repugnant (to the class) and perforce burdens Free Exercise.  And the burden is substantial not because the vaccine and the aborted tissue satisfy some arbitrary degree of connectedness but because the order to accept injection of the vaccine forces the religiously objecting Marine to choose between betraying a sincere religious conviction and suffering court martial or separation from the military and, likely, visiting adverse consequences on the Marine's family (such as the abrupt eviction from military housing and disenrollment from military schools).  The Marine Corps "dodges the question that RFRA presents . . . and instead addresses a very different question that the federal courts [and the military] have no business addressing."  *Burwell*, 573 U.S. 724.[12]

    2.    The record reveals a systemic failure by the Marine Corps to satisfy RFRA.

If an applicant demonstrates that the Marine Corps substantially burdens the applicant's Free Exercise, the government must "demonstrate" under 42 U.S.C. § 2000bb-1(b), that is, the government must bear the burden of going forward with the evidence and satisfying the burden of persuasion, that application of the burden

---

[12] Also, the Marine Corps asserts that even if the Pfizer COVID-19 vaccine is repugnant to certain religious beliefs, the applicant can accept a different COVID-19 vaccine. But the Marine Corps cites no source and provides no analysis suggesting that any other vaccine avoids the applicant's religious objection. Regardless, only the Pfizer COVID-19 vaccine has received FDA approval, and under 10 U.S.C. § 1107(a) the military cannot compel acceptance of a vaccine authorized for emergency use absent a waiver in writing by the President (no waiver has occurred). Accordingly, the Marine Corps can compel acceptance of the Pfizer vaccine only. *Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization*, 45 Op. O.L.C. ---, slip op. at 16 (July 6, 2021) ("DOD informs us that it has understood section 1107a to mean that DOD may not require service members to take an EUA product that is subject to the condition regarding the option to refuse, unless the President exercises the waiver authority contained in section 1107a.").

"to the person" both "(1) is in furtherance of a compelling governmental interest[] and (2) is the least restrictive means of furthering that compelling governmental interest." RFRA's focus on "the application of the burden to the person" demands more than dismissive, encompassing, and inflexible generalizations about the government's interest and about the absence of a less restrictive alternative. *Davila v. Gladden*, 777 F.3d 1198, 1206 (11th Cir. 2015) ("broadly formulated interests" and "generalized statement[s]" will not suffice). Instead, the government must proffer "specific and reliable evidence" (not formulaic and generic commands, policies, and conclusions) demonstrating that the marginal benefit flowing from a specific denial furthers a compelling governmental interest.

To permit adequate scrutiny of a particular denial, RFRA requires that the Marine Corps offer more than "generalized statements of interest, unsupported by specific and reliable evidence." *Davila*, 777 F.3d at 1206. In *Davila*, a federal prisoner asked to bring into the prison a set of beads necessary for a Santeria ritual. Under prison policy requiring that "religious items . . . be received only from 'approved vendors' listed in the prison catalog," the prison denied the prisoner's request because the beads could not be purchased from the catalog. *Davila*, 777 F.3d at 1202. The prisoner sued and alleged that the refusal violated RFRA. Relying on "a prison warden's terse affidavit" and "offer[ing] little more than a conclusory assertion" that "permitting inmates to obtain personal religious items from unauthorized sources . . . would drastically increase an inmate's ability to smuggle contraband [or] weapons" and that the individual screening of a religious item from an unauthorized source

would "have a major impact on prison resources," the prison employees argued that the refusal in accord with the prison policy satisfied RFRA. *Davila*, 777 F.3d at 1203–06. Holding that the prison employees "failed, as a matter of law, to meet their burden of demonstrating that their policy furthers a compelling government[al] interest," *Davila* instructs that an official "cannot simply utter[] magic words . . . and as a result receive unlimited deference from those of us charged with resolving these disputes." *Davila*, 777 F.3d at 1206–07 (citing *O Centro*, 546 U.S. at 438). The conclusory assertions by the prison employees "left [the Eleventh Circuit] to wonder" about the number of similarly situated objectors, the prison's process for screening objects, past incidents justifying the warden's fears, and "the actual costs and time the prison would need to spend on screening" religious items purchased from unauthorized sources. *Davila*, 777 F.3d at 1206. *Davila* continues that the prison employees failed to show "that the[] wholesale ban on religious items outside the catalog is the least restrictive means for furthering" a compelling interest. *Davila*, 777 F.3d at 1207. Thus, despite the "due deference" afforded "to the experience and expertise" of prison employees to maintain good order, security, and discipline, *Davila* finds RFRA's requirements unmet. *Davila*, 777 F.3d at 1206.

The record reveals a substantial likelihood that the Marine Corps fails systemically to conduct the analysis required by RFRA, that is, fails to discharge the burden of demonstrating — "to the person" — a compelling interest to vaccinate each applicant. First, the Marine Corps's formularized denial undermines the contention that the Marine Corps conducts an "individualized assessment" of an applicant. To

justify the denial of each applicant's appeal, the Marine Corps asserts that the denial furthers a compelling interest in military readiness and in securing the health of the force.  But "[military] officials cannot simply utter the magic words ['military readiness and health of the force'] and as a result receive unlimited deference from those of us charged with resolving the dispute."  *See Davila*, 777 F.3d at 1206 (citing *O Centro*, 546 U.S. at 438).  No appellate denial in the record addresses with any meaningful degree of specificity the factual circumstances of the applicant's service or analyzes the marginal increase, if any, in the risk of contagion incurred by granting the requested accommodation and the marginal detrimental effect, if any, on military readiness and the health of the force flowing from the specific denial of the applicant's requested accommodation from COVID-19 vaccination.  No denial assesses the age, fitness, health, or natural immunity of the applicant or otherwise assesses, for example, whether the particular applicant is acutely vulnerable to complications from COVID-19 as to warrant the suspension of the applicant's Free Exercise.  No appellate denial assesses whether the daily and tangible circumstances of an applicant's service are so likely to result in transmission to Marines as to warrant the suspension of the applicant's Free Exercise.  (Although the appellate record includes a checklist identifying the circumstances in which an applicant works in close proximity to others, a study of these appellate records reveals that even the most insular Marine is denied an accommodation — without explanation).  Although each appellate denial affirms that which no party disputes — that COVID-19 vaccination might promote to some extent the health and readiness of the force — no denial demonstrates

that accommodating a particular applicant will meaningfully impede the health and readiness of the 95% vaccinated force or meaningfully impede the military's operations and duties.

To bolster the asserted compelling interest, the Marine Corps relies on declarations by Lescher, Yun, and Rans. These affidavits fail, consistent with the balance of the Marine Corps's presentation, to focus on the assignment, duty, working circumstances, and performance and the like of a RFRA applicant. Further, for the most part, the declarations contain generalizations and conclusions about "the force" as a whole or aggregated portions of the whole force. The declarations fail, at a minimum, to disaggregate by age, by medical characteristics (for example, BMI, diabetes, high blood pressure, etc.), by assignment, and the like. The declarations evidence mostly historical data from the 2020 and 2021 pre-Omicron, pre-vaccine phase of the pandemic. A RFRA assessment by the Marine Corps ought to depend on data describing the present state of "the force" — after Omicron and after 95% vaccination and not on a date from 2020 or early 2021. In sum, the declarations, both bulky and full of numbers, say little or nothing about, for example, the marginal risk, if any, that a particular religiously objecting Marine cannot serve — consistent with the sincerely held religious belief — without vaccination as a reasonable accommodation that both preserves the compelling governmental interest and reasonably accommodates Free Exercise. That is the question, as to each applicant, the Marine Corps scrupulously avoids. But that is a question that RFRA burdens the Marine Corps to answer. It has not.

- 38 -

Second, the Marine Corps invariably rejects an accommodation because precautions other than vaccination lack comparable efficacy and "are often incompatible with the demands of military life." But RFRA demands an assessment of the "'marginal interest in enforcing' the challenged government action in that particular context." *Holt*, 574 U.S. at 363 (citing *Hobby Lobby*, 573 U.S. at 726–27). The Marine Corps's invoking the general observation that precautions other than vaccination might interfere with "the demands of military life" is insufficient to demonstrate "to the person," that is, in the "particular context" of an applicant's service, that no precaution other than vaccination is suitable. Further, the Marine Corps invariably fails to demonstrate in the context of each applicant that precautions other than vaccination remain unsuitable even though more than 95% of the Marine Corps is fully vaccinated against COVID-19.

Earlier orders discuss — for illustrative or suggestive purposes only — what sort of "to the person" evaluation one might expect to see if the Marine Corps had conducted that evaluation. For example, reason suggests that the Marine Corps might show why the Marine Corps cannot — in the facts of actual performance — accommodate a Marine, when 95% of the Marine Corps is vaccinated (and 98% of the whole United States military is vaccinated) and a relatively weak and transient COVID-19 variant is dominant, even though these same Marines served entirely without vaccination in 2020 during the height of the pandemic. The unrebutted feasibility of other accommodations, including an array of safety protocols, remains compelling (history is difficult to rebut). Perhaps the Marine Corps has a good

response — directed "to the person" of a Marine — but, because they fail to acknowledge the correct issue (or, at least, the correct focus of the issue), the Marine Corps's papers remain largely unresponsive. In other words, the efficacy of precautions other than vaccination is built into the record, and the Marine Corps undertakes no meaningful effort to disprove the suitability of these precautions. And the record reveals that the passage of time since the outbreak of COVID-19 has not deteriorated the efficacy of these alternative precautions. Rather, as the record confirms, the passage of time has resulted in an almost entirely vaccinated Marine Corps and in COVID-19 variants of much less severity, especially among strong, young, healthy, fit Marines — that is, by far the most of them.

Third, the Marine Corps in denying religious accommodations cites the requirement that every Marine be "worldwide deployable" and repeats that worldwide deployability requires vaccination against COVID-19. MARADMIN 612/21 3(c). But the Marine Corps cannot evade RFRA by defining the conditions of service to exclude the possibility of an accommodation. This definitional sleight of hand evades the inquiry that RFRA demands: whether the Marine Corps's generalized interest in worldwide deployability is materially impaired by tolerating a few religious objectors and accommodating their continued service to the Marine Corps despite the generalized policy of worldwide deployability.

Fourth, the failure to consider any accommodation that modifies the conditions of the religious objector's service to minimize the risk of COVID-19 while

- 40 -

retaining the benefit of the objector's skill, training, and experience reveals another systemic defect in the Marine Corps's resolution of religious accommodations.

Finally, the record confirms that the Marine Corps is most likely unable to establish, and certainly has not established, that permitting a minimal number of sincere RFRA objectors (comprising a minute fraction of the 18,600-member, 95%-vaccinated Marine Corps) to serve without adverse consequence to their rank and the terms and conditions of their service will adversely affect the governmental interest in the maintenance and readiness of the nation's military forces. In fact, the government undoubtedly has some considerable interest in maintaining the services of skilled, experienced, highly trained, patriotic, courageous, and esteemed Marines (and service members in other branches) in whom the public has an immense financial investment and who are not typically readily replaceable. The Marine Corps has focused exclusively on one factor and dismissed the other without comment.

C.    Irreparable harm

One irreparable harm suffered by a RFRA applicant unlawfully denied an accommodation is the accompanying order to accept COVID-19 vaccination and betray a religious conviction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) ("This principle applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms[.]"); *Holt*, 574 U.S. at 357–58 (extending this principle to RFRA). A religious

- 41 -

objector suffers a loss of religious exercise when government "puts [the objector] to this choice":  violate a sincerely held religious belief or "face serious disciplinary action."  *Holt*, 574 U.S. at 361.  In other words, a RFRA objector's claim ripens — and subjects the RFRA objector to irreparable harm — upon the threat of serious discipline, not upon the realization of the threat.  *See Steffel v. Thompson*, 415 U.S. 452, 459 ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.").  Because, as the Marine Corps willingly concedes, a Marine's failure to comply with an order to receive COVID-19 vaccination subjects the Marine to a "substantial threat" of serious discipline including discharge, a RFRA objector's claim ripens upon the receipt of the order to receive vaccination.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014).

Further, as *Air Force Officer v. Austin*, --- F. Supp. 3d ---, 2022 WL 468799 (M.D. Ga. Feb. 15, 2022), and *U.S. Navy SEALs 1–26 v. Biden*, --- F. Supp. 3d ---, 2022 WL 34443, at *1 (N.D. Tex. Jan. 3, 2022), correctly recognize, the "substantial pressure" on a religiously objecting Marine to obey the COVID-19 vaccination order and violate a sincerely held religious belief constitutes an irreparable harm warranting a preliminary injunction.  *See BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).  Requiring a Marine either to follow a direct order contrary to a sincerely held religious belief or to face immediate processing for separation or other punishment undoubtedly causes irreparable harm.  *Sambrano v. United Airlines, Inc.*, 2022 WL 486610, at *7 (5th Cir. 2022) (per curiam) ("Crucially, plaintiffs are not

- 42 -

seeking an injunction merely to prevent an adverse employment action . . . . Their allegation of irreparable harm based on coercion is antecedent to, independent from, and exogenous to any adverse employment action."); *Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 842 (5th Cir. 2021) (Ho, J., dissenting from denial of injunction pending appeal) ("To hypothesize that the earthly reward of monetary damages could compensate for these profound challenges of faith is to misunderstand the entire nature of religious conviction at its most foundational level.").

Because the Marine Corps has ordered many Marines and will order more to receive vaccination — an order that "puts [each plaintiff] to th[e] choice" of either betraying a sincerely held religious belief or facing a substantial threat of serious discipline — the class suffers a substantial burden under *Holt*, 574 U.S. at 361, and consequently suffers irreparable harm.

D.   The balance of equities and the public interest

Because the religiously objecting Marines request preliminary relief against officials of the federal government, the analysis on the balance of equities and the analysis on the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As the plaintiffs correctly argue, the public has no interest in tolerating an unnecessary infringement on Free Exercise. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145–47 (10th Cir. 2013); *Beckwith Elec. Co. v. Sebelius*, 960 F. Supp. 2d 1328, 1350 (M.D. Fla. 2013). "The vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012).

In opposition, the Marine Corps argues that preliminary relief "would encourage other members to attempt to bypass the military's process and ask courts to enter similar injunctive relief, which 'in the aggregate present the possibility of substantial disruption and diversion of military resources[.]'" *Parrish v. Brownlee*, 335 F. Supp. 2d 661, 669 (E.D.N.C. 2004)). But no injury to the public results from recognizing a person's constitutional or statutory right or from "encouraging" a person to vindicate that right in federal court, especially when the statute creating the right expressly authorizes such judicial vindication. Further, to the extent a "substantial disruption" results from the Marine Corps's systemic failure to assess a religious accommodation request "to the person," the "harm" suffered by defendants results only from the defendants' intractable failure to comply with RFRA.

By enacting RFRA, Congress guaranteed each Marine "appropriate relief" from an infringement on the Marine's Free Exercise. To say the least, an attempted evasion of judicial review strongly disserves the public interest. *See* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2947 (3d ed. Apr. 2021 update) ("Although the fundamental fairness of preventing irremediable harm to a party is an important factor on a preliminary-injunction application, the most compelling reason in favor of entering a Rule 65(a) order is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act."). For the past two years, the Marines serving in the Marine Corps have ably discharged their duties. Almost all served at the onset of the pandemic and served successfully during peak jeopardy in the pandemic and before any vaccination

against COVID-19 existed, almost all served during the height of the Delta variant surge, and almost all served during the Omicron variant. Nothing in the record establishes that preliminary injunctive relief for the religiously objecting Marines harms the public interest.  Preserving and extending the status quo for a brief interval protects Free Exercise and ensures judicial review of allegedly wrongful government action.  The record fails to demonstrate any meaningful increment of harm to national defense likely to result because these Marines continue to serve — as they have served — unvaccinated but in accord with other, proven, rigorous, and successful safety protocols.

## CONCLUSION

RFRA directs the district court to award a successful plaintiff an "appropriate remedy" to protect Free Exercise against undue restriction by any component of the federal government, which includes the legislative, the judicial, and the executive branch, including the armed forces and, in this instance, including the Marine Corps. The singular characteristics of the plaintiff class in this action, the singular nature of the defendants in this action, the singular statute at issue in this action, the singular breadth of the statutory remedy prescribed, and the singular public interest in preserving both a fundamental constitutional right and a robust and ready military, prompted direct inquiries with counsel for the plaintiffs about the plaintiffs' proposed remedy if finally successful in the action on the merits.  Counsel confirmed that the plaintiffs will not request (and the court will not, in any event, grant) an order

awarding the class of Marines or awarding any or every Marine individually, a religious accommodation under RFRA.

The class claims that the Marine Corps — in practice and despite publicly available orders from the Secretary of Defense and others — systematically and uniformly has denied and will deny imminently several thousand of, in fact, each and every one of, the applications for a RFRA accommodation from the COVID-19 vaccination requirement and has or imminently will subject those Marines to expulsion (and gratuitously rude and demeaning treatment in the interim). For a remedy, the plaintiffs request only (which is the only remedy foreseeably "appropriate") an order re-committing the Marines' applications *en masse* to the Marine Corps for a determination in accord with the "to the person" requirement and other requirements of RFRA. The determination of the application for an accommodation is a matter peculiarly within the province and expertise of, in this instance, the Marine Corps; the Marine Corps's compliance with the requirements of RFRA is a matter peculiarly within the province and expertise of the judiciary (otherwise, RFRA is without meaning or effect). Of course, any injunction must preserve at least minimally the status quo (that is, an injunction must protect each Marine against at least expulsion, forced vaccination, and retaliation for asserting RFRA rights) pending the Marine Corps's RFRA-compliant determination of each application.

The motion (Doc. 35) for class certification is **GRANTED-IN-PART**.  A

class is **CERTIFIED** comprising:

> All persons on active duty or in the ready reserve (1) who serve
> under the command of the Marine Corps, (2) who were af-
> firmed by a chaplain as harboring a sincere religious objection,
> (3) who timely submitted an initial request for a religious ac-
> commodation, (4) who were denied the initial request, (5) who
> timely appealed the denial of the initial request, and (6) who
> were denied or will be denied after appeal.

The plaintiffs' counsel is **APPOINTED** as class counsel.

The motion (Doc. 2) for a preliminary injunction is **GRANTED-IN-PART**.

The defendants are **PRELIMINARILY ENJOINED** (1) from enforcing against a

member of the class any order, requirement, or rule to accept COVID-19 vaccina-

tion, (2) from separating or discharging from the Marine Corps a member of the class

who declines COVID-19 vaccination, and (3) from retaliating against a member of

the class for the member's asserting statutory rights under RFRA.[13]

This preliminary injunction **EXCLUDES** Lieutenant Colonel 2[14] and USMC

Captain, each of which is separately protected by a preliminary injunction currently

---

[13] Nothing in this injunction precludes the defendants from considering a class member's "vaccination status in making deployment, assignment, and other operational decisions." *Austin v. U. S. Navy Seals 1-26,* 142 S. Ct. 1301 (2022).

[14] In accord with the severance order (Doc. 194), Lieutenant Colonel 2 remains a plaintiff in the original action, *Navy Seal 1 et al v. Austin et al*, 8:21-cv-2429-SDM-TGW. See Doc. 194 at 7.

on appeal.  This exclusion is without prejudice to a motion for inclusion of either after the pending appeal.

ORDERED in Tampa, Florida, on August 18, 2022.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE